**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br>BY HOTEL SPE-3 LLC,<br>          **Debtors.**[1] | Chapter 11<br><br>Case No. 26-10324 (JKS)<br>(Jointly Administered)<br><br>**Hearing Date**: June 16, 2026 at 11:00 a.m. (ET)<br>**Obj. Deadline**: May 27, 2026 at 4:00 p.m. (ET) |

**MOTION OF DEBTORS FOR ENTRY OF AN ORDER PURSUANT TO FED. R. BANKR. P. 9019 APPROVING FORBEARANCE AND SETTLEMENT AGREEMENT WITH APF-CPX I, LLC, ACCESS POINT FINANCIAL, LLC, AND HDDA, LLC**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), by and through their undersigned counsel, hereby move this Court (this "Motion") for entry of an order (the "Settlement Order"), substantially in the form attached hereto as **Exhibit A**, pursuant to section 105(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving the Forbearance and Settlement Agreement dated as of May 8, 2026 (the "Settlement Agreement"), by and among the Debtors, the non-debtor Obligors (as defined therein), and APF-CPX I, LLC, Access Point Financial, LLC, and HDDA, LLC (collectively, the "Lender Parties"). A true and correct copy of the Settlement Agreement is attached hereto as **Exhibit B**. In support of this Motion, the Debtors respectfully state as follows:

---

[1] The Debtors in these chapter 11 cases and the last four digits of their respective identification numbers are By Hotel SPE-3 LLC (3619); 1101 Wabash Development Mezz, LLC (9294); Wabash 11th Mezz LLC (4278); Pacific Tai Mezz LLC (3717); 1101 Wabash Development SPE LLC (9201); Wabash 11th LLC (3098); 1101 Wabash Development LLC (3365); Pacific Tai, LLC (9675); and SB Yen's Management Group, Inc. (1132). The location of the Debtors' corporate headquarters and the Debtors' service address is 806 N York Rd., Hinsdale, IL 60521.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The bases for the relief requested herein are section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019. Pursuant to Local Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final order by this Court in connection herewith consistent with Article III of the United States Constitution.

## BACKGROUND

### A. The Debtors and Their Business

4. On March 8, 2026 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court, initiating Case No. 26-10324 (JKS) (Jointly Administered) (the "Bankruptcy Cases"). The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or official committee of unsecured creditors has been appointed in the Bankruptcy Cases.

5. The Debtors own and operate Hilton and Best Western branded hotel properties in Chicago, Illinois The Debtors do not own or operate the Whitehall Hotel and the Evanston Northshore Hotel projects, which hotels were the subject of the loans from the Lender Parties, as described in more detail below. Debtor SB Yen's Management Group, Inc. has a management agreement with and some further involvement in the back-office operations of the entities that own and operate the Whitehall Hotel and the Evanston Northshore Hotel. Su-Mei Yen ("SMY") serves

as the principal officer of the Debtors and performs extensive operational and managerial duties critical to the Debtors' day-to-day hotel operations—including hotel management, vendor relations, financial oversight, and restructuring efforts. Her husband, Hui-Hsien Yen (together with SMY, the "Yens"), is also a party to the loan documents described herein.

6.      Additional information regarding the Debtors' business and the circumstances leading to these chapter 11 cases is set forth in the *Amended Declaration of Su-Mei Yen in Support of Debtors' First Day, Cash Collateral, and Debtor in Possession Financing Motions* (the "First Day Declaration") [Doc. No. 20], which is incorporated herein by reference.

**B.  The APF Loans and Pre-Petition Defaults**

7.      Prior to the Petition Date, Access Point Financial, LLC ("APF") made two loans to certain non-debtor obligors: (i) a $10,000,000 loan (the "Whitehall Loan") to 11th St. Wabash, LLC, Michigan Wabash 11th LLC, WH Investment Properties, L.P., and Whitehall Hotel SPE, Inc. (together, the "Whitehall Borrowers"), evidenced by a Pledge Promissory Note dated February 3, 2016, payable to HDDA, LLC ("HDDA"), as successor to APF; and (ii) a $5,000,000 loan (the "Evanston Loan", and together with the Whitehall Loan, the "Loans") to Evanston Northshore Hotel Partners, L.P. (the "Evanston Borrower"), evidenced by a Pledge Promissory Note dated December 7, 2018.

8.      The Yens executed personal guaranties of both Loans. Debtor SB Yen's Management Group, Inc. was a pledgor on the Whitehall loan documents. APF-CPX I, LLC ("CPX I", and together with APF and HDDA, the "Lender Parties") holds certain interests in connection with the Loans.

9.      The borrowers defaulted under the loan documents by failing to make payments as and when due. On October 5, 2021, APF and CPX I filed a complaint against the Yens in the

United States District Court for the Northern District of Georgia (the "District Court"), initiating Case No. 1:21-cv-04114-SDG (the "District Court Case"), asserting claims against the Yens under the personal guaranties.

10.     On October 25, 2022, the parties entered into a settlement agreement (as amended by a First Amendment dated November 16, 2024, the "Prior Settlement Agreement") to resolve the District Court Case. The Yens subsequently defaulted under the Prior Settlement Agreement by failing to make payments as and when due. On February 20, 2026, as APF and CPX I contend is permitted by the Prior Settlement Agreement, APF and CPX I filed a Notice of Default and Request for Entry of Consent Judgment in the District Court Case (the "Default Request"), seeking entry of a substantial consent judgment against the Yens personally—approximately $11.7 million on the Whitehall Loan and $7.7 million on the Evanston Loan.

**C.  The Stay Motion and Events Leading to the Settlement Agreement**

11.     On April 13, 2026, the Debtors filed the *Motion for Entry of an Order Extending the Automatic Stay to Non-Debtor Guarantors Su-Mei Yen and Hui-Hsien Yen pursuant to 11 U.S.C. §§ 105(a) and 362 and Granting Related Relief* (the "Stay Motion") [Doc. No. 120].

12.     The Stay Motion sought a temporary extension of the automatic stay to shield the Yens from the District Court Case on two independent grounds. First, there was a clear identity of interest between the Debtors and the Yens: the original loan proceeds funded Debtor hotel projects, Debtor SB Yen's Management Group, Inc. was an original pledgor, and all payments were historically serviced from Debtor hotel revenues Debtors contend that any judgment entered against the Yens would directly impact the Debtors' estates. The Lender Parties dispute that the proceeds of its Loans were used for the Debtor hotel projects and that revenues from the Debtor hotels were used to service the Loans. Second, the Debtors believe that continuation of the District

Court Case would impose immediate and irreparable harm on the Debtors' reorganization efforts. SMY performs the substantial majority of the operational and administrative work required to run the Debtors' hotels and administer the estates. Requiring her to simultaneously defend complex multi-million dollar Georgia litigation on an emergency timeline would materially impair hotel operations and undermine the reorganization. The Lender Parties dispute that entry of the Consent Judgment would impact SMY's ability to administer the Debtors' estates because the litigation concluded and the only remaining task is to enter the Consent Judgment. The Stay Motion sought a limited extension of time (of only 2–4 weeks) and did not seek to discharge or permanently release any claims against the Yens; it merely sought to preserve the status quo long enough for the Debtors to complete necessary due diligence and determine the proper treatment of the Lender Parties' obligations within these chapter 11 cases, and to accommodate the Court's schedule. More than four weeks have passed since the filing of the Stay Motion and the Debtors have received the benefit of the relief sought therein because the District Court did not enter the Consent Judgment.

13.    On April 14, 2026, the Lender Parties filed a substantive objection to the Stay Motion [Doc. No. 133], and the Court scheduled a hearing for May 11, 2026.

14.    In the period leading up to the May 11, 2026 hearing, the Debtors, Obligors, and the Lender Parties engaged in good-faith, arm's-length negotiations to resolve both the Stay Motion and the Existing Defaults under the Prior Settlement Agreement. Those negotiations culminated in the Settlement Agreement, executed as of May 8, 2026.

15.    The Debtors contemplated either filing a motion to approve the Settlement Agreement under Federal Rule of Bankruptcy Rule Procedure 9019 or submitting a proposed Stipulated Order under Certification of Counsel to consummate the settlement of the Stay Motion and the District Court Case and have the Settlement Agreement approved by the Court, as required

176608056.1                                                           5

by Section 6(a) of the Settlement Agreement. At the May 11, 2026 hearing, the Court indicated that a 9019 motion would be the appropriate mechanism to approve the Settlement Agreement.

## MATERIAL TERMS OF THE SETTLEMENT AGREEMENT

16.     The Settlement Agreement (**Exhibit B**) contains the following material terms, among others:

a.  **Immediate Payments.** On or before May 8, 2026, the Obligors paid HDDA (i) $55,000.00 applied to accrued and unpaid interest (the "May Interest Payment") and (ii) $25,000.00 as a partial payment of the Lender Parties' attorneys' fees and expenses[2].

b.  **Monthly Interest Payments.** Commencing June 1, 2026 and continuing on the first of each month through the New Maturity Date, the Obligors shall make monthly interest payments to HDDA at 5% per annum on the outstanding unpaid principal balance and COVID-deferred interest.

c.  **New Maturity Date.** All principal, unpaid accrued interest, COVID-deferred interest, and the Lender Parties' reasonable and documented attorneys' fees (excluding default-rate interest, late fees, and the Exit Fee) shall be paid in full on or before May 8, 2027.

d.  **Capitalization of Past-Due Interest.** As of May 8, 2026, all unpaid non-default-rate interest is added to the principal balance of the Loans.

e.  **Conditional Waiver of Default-Rate Interest, Late Fees, and Exit Fee.** Provided there is no New Event of Default and the Loans are satisfied in full by the New Maturity Date, HDDA agrees to waive default-rate interest, late fees, and the Exit Fee—a significant concession representing a material reduction from the amounts otherwise owed.

f.  **Acknowledged Amounts.** The Obligors and Debtors acknowledge amounts owed to HDDA as of February 20, 2026: approximately $11,703,592.09 on the Whitehall Loan and $7,705,389.42 on the Evanston Loan, each before credit for amounts received under the Prior Settlement Agreement.

g.  **Withdrawal of Default Request.** Within one business day of the Agreement Date, the Lender Parties withdrew (without prejudice) the Default Request in the District Court Case. Upon a New Event of Default, the Lender Parties may reinstate their request for entry of the Consent Judgment.

h.  **Cooperation with Refinancing.** The Lender Parties agreed to reasonably cooperate with the Obligors' good-faith refinancing efforts.

---

[2] These payments were already made by May 8, 2026.

176608056.1                                           6

i.   **Releases.** The Obligors, and the Debtors subject to Bankruptcy Court approval, granted releases to the Lender Released Parties of all claims from the beginning of time through the Agreement Date relating to the Loans, the Bankruptcy Cases, the District Court Case, and all related dealings. See Section 8 of the Settlement Agreement and the discussion in Section C below.

j.   **New Events of Default.** Specified events constitute "New Events of Default" triggering immediate acceleration, including payment failures (subject to a five-business-day cure, limited to three times per calendar year), material covenant breaches, judgments in excess of $500,000 against any Borrower, new insolvency proceedings affecting Obligors, and the Bankruptcy Court's failure to enter the Stipulated Order by May 13, 2026.

k.   **Withdrawal of the Stay Motion.** Upon entry of the Stipulated Order, the Debtors agreed to withdraw the Stay Motion with prejudice, fully resolving the contested matter between the Debtors and the Lender Parties in this Court.

## BASIS FOR RELIEF

**A.  Legal Standard Under Bankruptcy Rule 9019**

17.    Bankruptcy Rule 9019(a) provides that the court may approve a compromise or settlement on motion by the trustee after notice and a hearing. Fed. R. Bankr. P. 9019(a). Compromises and settlements are "a normal part of the process of reorganization," *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968), and are "favored in bankruptcy." *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 831 (Bankr. D. Del. 2008).

18.    Courts in this district evaluate proposed settlements under the four-factor test of *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996): (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation, including expense, inconvenience, and delay; and (4) the paramount interest of the creditors. The court need not conduct a "mini-trial" on the merits but must only "canvass the issues" to determine whether the settlement falls within the "range of reasonableness." *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006). As detailed below, each factor supports approval.

**B. The *Martin* Factors Weigh Strongly in Favor of Approval**

**(i)  Probability of Success in Litigation.**

19.    Without the Settlement Agreement, the Debtors would face contested litigation on the Stay Motion and, if the Stay Motion were denied, the near-certain and immediate entry of a multi-million dollar Consent Judgment against the non-debtor Yens personally in the District Court Case. The Lender Parties filed a substantive objection to the Stay Motion. While the Debtors believe the Stay Motion had merit—given the identity of interest between the Debtors and the Yens' and SMY's operational indispensability—courts apply the 'unusual circumstances' test conservatively, and litigation outcomes are inherently uncertain. A contested hearing would have consumed significant estate resources, and even a fully successful outcome would have merely delayed, rather than resolved, the Lender Parties' claims. The Settlement Agreement, if approved, eliminates this risk entirely. In the event that this Motion is denied, the Settlement Agreement as to the Debtors is null and void and as to the non-Debtors is an Event of Default, and the Debtors and Lender Parties will be back before the Court to litigate the issues raised in the Stay Motion.

20.    Moreover, even if the Debtors prevailed on the Stay Motion, the underlying Loans and Existing Defaults would remain. Continued litigation would therefore produce, at best, a temporary stay of enforcement, not a resolution of the approximately $19.4 million debt. In addition to the benefit of not having the Consent Judgment entered against them, the Settlement Agreement provides the Yens with an extended maturity date, deferral and/or waiver of default interest and past due interest and interest only payments for the next year, among other benefits. Thus, the Settlement Agreement achieves a comprehensive, permanent resolution.

**(ii)  Difficulties in Collection.**

21.     The Debtors are not asserting affirmative monetary claims against the Lender Parties in this settlement, so this factor does not weigh against approval. To the extent applicable, the Debtors note that pursuing any claims against a sophisticated financial institution would present its own collection and litigation challenges that would further deplete the resources of the estates, further supporting a negotiated resolution over protracted litigation.

**(iii)  Complexity, Expense, and Delay of Litigation.**

22.     The litigation landscape here is multi-jurisdictional and complex. Debtors contends that continuation of this dispute would require the Debtors to simultaneously prosecute the Stay Motion in this Court while monitoring the District Court Case in the Northern District of Georgia—each requiring separate counsel, briefing, expert involvement, and court appearances. The Lender Parties dispute that entry of the Consent Judgment in the District Court Case will require further litigation. The two proceedings would impose compounding costs on the estates.

23.     More significantly, Debtors contend that SMY—who is indispensable to estate administration, reorganization and daily hotel operations—would be required to divert substantial time and resources to active litigation defense, which the Lender Parties dispute because the litigation is concluded and all that remains is entry of the Consent Judgment. The Stay Motion itself was premised in part on this exact concern: that requiring SMY to respond to an allegedly "rushed" Georgia proceeding on an emergency timeline would materially impair the Debtors' ability to administer their estates. That concern remains fully applicable to any resumed litigation. The Settlement Agreement eliminates this burden and allows the Debtors to focus exclusively on operations and reorganization.

**(iv)  Paramount Interest of Creditors.**

24.     The Settlement Agreement is in the paramount interest of the Debtors' creditors. First, it eliminates the existential risk that a $19+ million Consent Judgment is entered against the Yens, which would seriously destabilize the Debtors' leadership, impair hotel operations, and potentially force a liquidation that would harm all creditors by eliminating potential refinancing options tied to the Yens' credibility and creditworthiness. In short, the estates could face irreparably dire consequences.  Second, by reducing the applicable interest rate to 5% per annum (well below the contractual default rate) and waiving default-rate interest, late fees, and the Exit Fee upon timely payoff by May 8, 2027, the Settlement Agreement dramatically reduces the economic burden on SMY and by extension the Debtors, and creates a viable path to full satisfaction of the Loans through refinancing or a sale. Third, allowing SMY to remain focused on hotel operations directly protects the going-concern value of the estates for the benefit of all creditors. The Settlement Agreement achieves all of this without the cost, delay, and uncertainty of contested multi-jurisdictional litigation.

**C.  The Releases Are Appropriate and the Estate Is Not Surrendering Valuable Assets**

25.     Section 8 of the Settlement Agreement provides that the Debtors, subject to Bankruptcy Court approval, release the Lender Released Parties from all claims arising through the Agreement Date relating to the Loans, the Bankruptcy Cases, the District Court Case, and all related dealings. The Debtors respectfully submit that these releases are fair, reasonable, and appropriate for the following independent reasons.

26.     **First, the estate has no material claims to release.** The Debtors have reviewed their potential affirmative claims based on best available information against the Lender Parties and have not identified any colorable claim of meaningful economic value. The Lender Parties are

secured creditors who made two loans to non-debtors, received personal guaranties, and upon default sought to enforce the guaranties through a pre-existing consent judgment—conduct entirely within the ordinary course of a secured creditor's rights. The Stay Motion was not premised on any wrongdoing by the Lender Parties against the estates (and the Debtors have not identified any such wrong doing); it was premised solely on the Debtors' need for additional time to review complex intercompany transactions and protect SMY from severe distraction during a critical period. With the benefit of that time, the Debtors have not identified any viable preference, fraudulent transfer, or lender liability theory against the Lender Parties. The release of speculative, unidentified, or basically nonexistent claims has no economic cost to the estate.

27. **Second, the primary thing the Debtors are releasing—as a practical matter— is the right to file another stay extension motion, and that right has been rendered moot by the Settlement Agreement itself.** The Stay Motion was filed for a single, limited purpose: to allow the Debtors time to negotiate while SMY was protected from the immediate threat of the Consent Judgment. The Settlement Agreement accomplishes everything the Stay Motion sought and more. The Default Request has been permanently withdrawn (absent a New Event of Default). SMY is no longer at risk of an emergency enforcement action in the District Court. The Lender Parties have committed to forbear through May 8, 2027, subject to SMY's compliance with the requirements in the Settlement Agreement. The Lender Parties further agreed to reasonably cooperate with any good-faith refinancing efforts, subject to a subsequent agreement as to the proceeds thereof to be paid to the Lender Parties. There is simply nothing left for a renewed stay motion to protect against. Releasing the right to re-litigate a motion that has been substantively mooted is not a meaningful concession.

28.    **Third, the releases are the product of arm's-length negotiation and constituted essential consideration for the Lender Parties' agreement to forbear.** Courts in this district regularly approve releases in Rule 9019 settlements where, as here, the releases are mutual, negotiated between sophisticated parties represented by counsel[3], and exchanged for substantial consideration. *See, e.g., In re Coram Healthcare Corp.*, 315 B.R. 321, 335-36 (Bankr. D. Del. 2004) (approving releases as part of settlement where they were essential consideration and the releasors received fair value); *In re Washington Mutual, Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011) (approving broad settlement releases where no viable estate claims were being surrendered and the resolution provided significant benefit to the estates).

29.    **The consideration received by the estates in exchange for the Debtors' releases is concrete and substantial:** a reduction of the interest rate from the default rate to 5% per annum; complete waiver of default-rate interest, late fees, and the Exit Fee (potentially millions of dollars of savings) upon timely payoff; a New Maturity Date through May 8, 2027 providing a full year to refinance; withdrawal of the Default Request that threatened the Yens with a $19+ million judgment; the Lender Parties' commitment to cooperate with refinancing; and definitive, permanent resolution of all pending litigation in two courts. This exchange is heavily favorable to the estates and falls well within—indeed, well above—the range of reasonableness required for settlement approval.

30.    In sum, when assessed against the *Martin* factors and applicable law, the Settlement Agreement—including its release provisions—is a fair, reasonable, and beneficial resolution that serves the best interests of the Debtors, their estates, and their creditors. The Court should approve it.

---

[3] For the avoidance of doubt, the Obligors were represented by separate counsel of their choice, not undersigned counsel.

## NOTICE

31.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the Office of the United States Attorney for the District of Delaware; (iii) counsel to the Secured Lender; (iv) the Internal Revenue Service; (v) the Debtors' twenty largest unsecured creditors, excluding insiders; (vi)counsel to the Lender Parties ; and (vii) all parties that have requested notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002. The Debtors submit that no other or further notice is required under the circumstances.

## NO PRIOR REQUEST

32.     No prior request for the relief sought in this Motion has been made to this Court or any other court..

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court (i) enter the Settlement Order in substantially the form attached hereto as **Exhibit A**, approving the Settlement Agreement pursuant to Bankruptcy Rule 9019, and (ii) grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: May 13, 2026
        Wilmington, Delaware          **LEWIS BRISBOIS BISGAARD & SMITH LLP**

                                        */s/ Rafael X. Zahralddin-Aravena*
                                        Rafael X. Zahralddin-Aravena (No. 4166)
                                        500 Delaware Avenue, Suite 700
                                        Wilmington, Delaware 19801
                                        Tel: 302.985.6000
                                        Rafael.Zahralddin@lewisbrisbois.com

                                        --and--

                                        Minyao Wang (*pro hac vice* admitted)

176608056.1                                  13

7 World Trade Center
250 Greenwich Street, 11th Floor
New York, NY 10007
Tel: (212) 232-1300
minyao.wang@lewisbrisbois.com

*Proposed Attorneys for the Debtors and Debtors in Possession*