**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BY HOTEL SPE-3 LLC, | Case No. 26-10324 (JKS) |
| Debtors.[1] | (Jointly Administered) |
| | **Related to D.I. 186** |

**SECURED LENDER'S OBJECTION TO
MOTION OF DEBTORS FOR ENTRY OF
AN ORDER PURSUANT TO FED. R. BANKR. P. 9019
APPROVING FORBEARANCE AND SETTLEMENT AGREEMENT
WITH APF-CPX I, LLC, ACCESS POINT FINANCIAL, LLC, AND HDDA, LLC**

ACORE Capital Mortgage, LP, in its capacity as Administrative Agent of Delphi CRE Funding LLC ("Secured Lender"), by and through its undersigned counsel, hereby files this objection (the "Objection") to *Motion of Debtors for Entry of an Order Pursuant to Fed. R. Bankr. P. 9019 Approving Forbearance and Settlement Agreement With APF-CPX I, LLC, Access Point Financial, LLC, and HDDA, LLC* [Doc. No. 186] (the "Settlement Motion")[2] and respectfully states as follows:

**PRELIMINARY STATEMENT**

The Debtors seek this Court's approval of a settlement to resolve claims asserted by a third-party lender, APF, against the Yens – the Debtors' principals – in their personal capacities. According to the Debtors, the Stay Motion that preceded the Settlement Motion was filed for a

---

[1]    The Debtors in these chapter 11 cases and the last four digits of their respective identification numbers are By Hotel SPE-3 LLC (3619); 1101 Wabash Development Mezz, LLC (9294); Wabash 11th Mezz LLC (4278); Pacific Tai Mezz LLC (3717); 1101 Wabash Development SPE LLC (9201); Wabash 11th LLC (3098); 1101 Wabash Development LLC (3365); Pacific Tai, LLC (9675); and SB Yen's Management Group, Inc. (1132). The location of the Debtors' corporate headquarters and the Debtors' service address is 806 N York Rd., Hinsdale, IL 60521.

[2]    Capitalized terms but not otherwise used herein shall have the meanings ascribed to such terms in the Settlement Motion.

"single, limited purpose: to allow the Debtors time to negotiate while [Su-Mei Yen] was protected from the immediate threat of the Consent Judgment." Settlement Mot. ¶ 29.

As detailed herein, the terms of the Settlement Agreement, however, benefit only the Yens[3] and certain non-debtor affiliates under the control of the Yens. Meanwhile the Debtors, who are providing expansive releases of APF, including of any claims that the Debtors may have against APF arising from the APF Loans, receive nothing from the Settlement Agreement – be it in the form of a cash contribution or release by either APF or any other non-debtor party to the agreement.

To further compound matters, the Debtors have provided no evidence (despite repeated requests from Secured Lender) that the Debtors and the non-debtor parties to the Settlement Agreement were represented by separate counsel in negotiating the Settlement Agreement other than an unsworn statement that the non-debtor parties were represented by "separate counsel of their choice." Settlement Mot. ¶ 28 n.3. It is therefore questionable whether the Settlement Agreement is truly the product of an arm's-length negotiation. This issue is critical where the Debtors' insiders stand to benefit the most from the terms of the Settlement Agreement.

Simply put, the Debtors have failed to meet their burden under the *Martin* factors and other relevant factors that courts consider when evaluating a proposed settlement. The Settlement Agreement falls below the lowest point in the "range of reasonableness," it is not fair and equitable, it is not supported by consideration (at least from the perspective of the Debtors or their respective estates) and it is not in the best interests of the Debtors' estates. Consequently, the Settlement Motion should be denied.

---

[3]     Under the Settlement Agreement, the Yens would be "protected" from a nearly $20 million personal judgment, and the non-debtor borrowers under the APF Loans receive the benefits of, among other things, a reduced interest rate, the waiver of certain fees, and an extended maturity date. Settlement Mot. ¶ 27.

**RELEVANT BACKGROUND**

1.      On March 8, 2026 (the "Petition Date"), each of the above-captioned debtors (the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

2.      Secured Lender holds a first priority lien on substantially all assets, including cash, of certain of the Debtors (*i.e.*, those Debtors who are party to certain loan agreements with Secured Lender).[4]

The Stay Motion

3.      The Settlement Motion was filed in response to the Stay Motion, which currently remains pending before this Court.  *See* Settlement Mot.  ¶¶ 11-15.

4.      On April 13, 2026, the Debtors filed the *Motion for Entry of an Order Extending the Automatic Stay to Non-Debtor Guarantors Su-Mei Yen and Hui-Hsien Yen Pursuant to 11 U.S.C. §§ 105(a) and 362 and Granting Related Relief* [Doc. No. 120] (the "Stay Motion").

5.      In the Stay Motion, the Debtors sought to extend the stay automatically imposed under section 362 of the Bankruptcy Code to Su-Mei Yen and Hu-Hsien Yen (together, the "Yens") in their capacity as non-debtor guarantors.  Stay Mot. ¶ 13

6.      As alleged in prior pleadings filed with the Court, prior to the Petition Date, APF[5] had sued the Yens in federal court (the "Georgia Action") in their personal capacities as guarantors under two loans made by APF, as lender, to certain non-debtor borrowers (together, the "APF Loans").  APF Opposition (as defined below) ¶ 3.

---

[4]      For further information regarding Secured Lender's relationship with the Debtors, *see generally Secured Lender's Limited Objection to (A) Debtors' Emergency Motion for Authority to Use Cash Collateral, and Objection to (B) Debtors' Emergency Motion to Obtain Junior Secured Postpetition Financing* (the "Cash Collateral Objection") [Doc. No. 34] at paragraphs 17-40.

[5]      As used herein, "APF" collectively refers to Access Point Financial, LLC, HDDA, LLC, and APF-CPX I, LLC, which the Debtors assert "holds certain interests in connection with" the APF Loans.  Settlement Mot. ¶ 8.

3

7. On February 20, 2026, APF requested in the Georgia Action entry of a consent judgment against the Yens (the "Consent Judgment"). APF Opp. ¶ 25.

8. Following APF's filing of the Consent Judgment, the Debtors requested from this Court a stay of the Georgia Action for two to four weeks to "complete a comprehensive review of intercompany transfers and the APF loan history" and "evaluate potential incorporation of the APF claim into these chapter 11 cases." Stay Mot. ¶ 13.

9. In support of this request, the Debtors expressly alleged that they "have identified material allegations and concerns regarding the proper characterization of the APF claim, including whether it should be treated as a claim against the Debtors' estates (given the use of proceeds for Debtor projects and the involvement of Debtor entities)." Stay Mot. ¶ 11.

10. In the Stay Motion, the Debtors also asserted that "unusual circumstances" existed to extend section 362's automatic stay to the Yens in the Georgia Action because, among other things, "the APF loan directly implicates Debtor entities (including SB Yen's Management Group, Inc.), the proceeds funded Debtor hotel projects, and payments were serviced from Debtor hotel revenues." Stay Mot. ¶ 17.

APF's Opposition to the Stay Motion

11. On April 15, 2026, APF filed the *Objection to Debtors' Motion for Entry of an Order Extending the Automatic Stay to Non-Debtor Guarantors Su-Mei Yen and Hui-Hsien Yen* [Doc. No. 133] (the "APF Opposition").

12. In the APF Opposition, APF alleged that: (a) none of the Debtors received loans or money from APF, (b) although Debtor SB Yen's Management Group, Inc. ("SBY") was a party to certain prepetition settlement agreements with APF, it was not a defendant in the Georgia Action,

4

and (c) APF through the Georgia Action was not seeking any relief against SBY or any assets of SBY. APF Opp. ¶¶ 23, 25.

13.     APF also alleged that the Consent Judgment (which APF was seeking to enforce prior to the filing of the Stay Motion) was only against the Yens. *Id.* at ¶ 17.

The Settlement Motion

14.     On May 13, 2026, the Debtors filed the Settlement Motion seeking approval, pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, of that certain Forbearance and Settlement Agreement dated as of May 8, 2026 by and among the Debtors, the non-debtor Obligors (as defined therein), and APF (the "Settlement Agreement"). The Settlement Agreement is attached to the Settlement Motion as Exhibit B.

15.     In the Settlement Motion, the Debtors, despite the assertions in the APF Opposition, restate that "the original loan proceeds funded Debtor hotel projects, Debtor SB Yen's Management Group, Inc. was an original pledgor,[6] and all payments were historically serviced from Debtor hotel revenues." Settlement Mot. ¶ 12.

16.     The Debtors also allege that the Settlement Agreement and the releases provided for therein (as explained in further detail below) were the product of arm's-length negotiation. *See* Settlement Mot. ¶¶ 14, 28.

17.     Specifically, the Debtors state that the non-debtor Obligors "were represented by separate counsel of their choice, not undersigned counsel." Settlement Mot. ¶ 28 n.3.[7]

---

[6]     The Settlement Motion does not explain what is meant by SBY being an "original" pledgor with respect to the APF Loans.

[7]     No separate counsel has appeared for any of the Obligors with respect to the Settlement Motion or elsewhere in these Chapter 11 Cases and, as of the date hereof, no entry of appearance has been filed by counsel for any of the Obligors.

5

18.   The Debtors assert that their entry into, and this Court's approval of, the Settlement

Agreement is warranted primarily for the following reasons:

- *Probability of Success in Litigation*:   "Continued litigation would therefore produce, at best, a temporary stay of enforcement, not a resolution of the approximately $19.4 million debt. **In addition to the benefit of not having the Consent Judgment entered against them, the Settlement Agreement provides the Yens** with an extended maturity date, deferral and/or waiver of default interest and past due interest and interest only payment for the next year, among other benefits.   Thus, the Settlement Agreement achieves a comprehensive, permanent resolution."   Settlement Mot. ¶ 20 (emphasis added).

- *Paramount Interest of Creditors*:   "First, [the Settlement Agreement] eliminates **the existential risk that a $19+ million Consent Judgment is entered against the Yens**, which would seriously destabilize the Debtors' leadership, impair hotel operations, and potentially force a liquidation that would harm all creditors by eliminating potential refinancing options tied to the Yens' credibility and creditworthiness. . . . Second, by reducing the applicable interest rate to 5% per annum (well below the contractual default rate) and waiving default-rate interest, late fees, and the Exit Fee upon timely payoff by May 8, 2027, **the Settlement Agreement dramatically reduces the economic burden on SMY** and by extension the Debtors, and creates a viable path to full satisfaction of the Loans through refinancing or a sale."   Settlement Mot. ¶ 24 (emphasis added).

- *The Releases Are Appropriate and the Estate is Not Surrendering Valuable Assets*:   "**[T]he primary thing the Debtors are releasing—as a practical matter— is the right to file another stay extension motion, and that right has been rendered moot by the Settlement Agreement itself.** The Stay Motion was filed for a single, limited purpose: to allow the Debtors time to negotiate while SMY was protected from the immediate threat of the Consent Judgment." Settlement Mot. ¶ 27 (emphasis in original).  And "[t]he **consideration received by the estates** in exchange for the Debtors' releases is concrete and substantial: a reduction of the interest rate from the default rate to 5% per annum; complete waiver of default-rate interest, late fees, and the Exit Fee (potentially millions of dollars of savings) upon timely payoff; a New Maturity Date through May 8, 2027 providing a full year to refinance; **withdrawal of the Default Request that threatened the Yens with a $19+ million judgment**; the Lender Parties' commitment to cooperate

with refinancing; and definitive, permanent resolution of all pending litigation in two courts."  Settlement Mot. ¶ 29 (emphasis added).

The Settlement Agreement

19.     The Settlement Agreement purports to bifurcate the responsibilities of the "Obligors" and the Debtors thereunder.  The Settlement Agreement defines the Obligors to include (a) the non-debtor borrowers under the APF Loans, (b) the Yens in their personal capacities as guarantors, and (c) certain other individuals in their capacities as pledgors.  Settlement Agreement at 1.

20.     The Debtors are parties solely as it relates to Sections 6, 8, 9, 10, 12 and 13 of the Settlement Agreement.  Settlement Agreement at 1.

21.     SBY, however, is included both in the definition of "Debtors" as parties to the Settlement Agreement **and** in the definition of "Evanston Pledgors."  Settlement Agreement at 1. The Evanston Pledgors are also included in the definition of "Obligors."  *Id.*

22.     Section 8 of the Settlement Agreement provides for **non**-mutual releases by each of the Obligors and the Debtors in favor of APF (*i.e.*, APF provides no releases to either the Debtors or the Obligors).  As it relates to the Debtors, Section 8(c) states:

> Debtors hereby, subject to the express approval of the Bankruptcy Court, release, acquit and forever discharge APF, CPX I, HDDA, and **each of their respective past and present officers, directors, shareholders, partners, agents, employees, attorneys, heirs, assigns, representatives, affiliates, successors and predecessors in interest** (collectively, the "Lender Released Parties"), of and from any and all actions, causes of action, claims, suits, damages, judgments, liens, rights, costs, expenses, demands and compensation whatsoever in law and/or equity, that Debtors, whether collectively or individually, had, now has, or may later have or claim to have against any of the Lender Released Parties, now accrued or that may hereafter accrue, that have or allegedly have existed, occurred, happened, arisen, or transpired at any time from the beginning of time to the Effective Date, WHICH DO OR MAY EXIST, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, FORESEEN OR UNFORESEEN (collectively,

the "Debtor Released Matters", together with the Obligor Released Matters, the "Released Matters"), including, without limitation, any of the same arising from or related to anything done, omitted to be done, or allowed to be done by any of the Lender Released Parties and **in any way connected with this the District Court Case, the Bankruptcy Case, this Agreement, the Settlement Agreement, the Loan Documents, the Loans, any funds disbursed or not disbursed thereunder or the manner of such disbursement, any other credit facilities provided or not provided, or any past or present deposit or other accounts (including, without limitation, "dominion of funds" accounts and lockbox arrangements), and any other dealings between any of the Debtors and any of the Lender Released Parties.**

Emphasis added in bold.

Events Prior to the Filing of Secured Lender's Objection

23.     Prior to the filing of the Objection, Secured Lender's counsel requested that the Debtors' advisors provide, among other information (a) the identity of the law firm that represented any non-Debtor entities, including, without limitation, the Yens, in the negotiation and preparation of the Settlement Agreement, (b) which entity or entities made (or will make) the requisite payments to APF required under the terms of the Settlement Agreement, (c) all documents and any other analysis regarding the sources and uses of the APF Loans as they relate to the Debtors and their operations, and (d) all documents and analysis regarding the Debtors' evaluation of any claims of the Debtors that may exist against APF relating to the APF Loans.

24.     As of the filing of the Objection, Secured Lender has received no response to the above inquiries.

**ARGUMENT**

A.     Legal Standard.

25.     Courts in this district evaluate proposed settlements under the four-factor test of *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996): (1) the probability of success in litigation; (2) the likely

8

difficulties in collection; (3) the complexity of the litigation, including expense, inconvenience, and delay; and (4) the paramount interest of the creditors.

26.     The relevant inquiry under Bankruptcy Rule 9019 is whether the compromise "falls within the range of reasonableness and serves the best interest of the estate." *In re Mulkerin*, No. 1:24-BK-03264-HWV, 2025 WL 2402287, at \*17 (Bankr. M.D. Pa. May 28, 2025).  In addition, courts must determine whether a proposed settlement is fair and equitable; under this standard, courts "look to the fairness of the settlement to other persons, *i.e.*, the parties who did not settle." *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 136 (Bankr. D.N.J. 2010).

27.     To obtain approval of a settlement, the proponent must demonstrate that the settlement satisfies, by a preponderance of the evidence, the requirements imposed by Bankruptcy Rule 9019 and the *In re Martin* test.  *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 509 (Bankr. D. Del. 2010).

28.     Courts may also consider additional factors, such as: the competency and experience of counsel who support the settlement; the nature and breadth of releases to be obtained by the parties to the settlement; and the extent to which settlement is the product of arm's-length bargaining.  *In re Scripsamerica, Inc.*, 634 B.R. 863, 874 (Bankr. D. Del. 2021).

29.     Further, where an insider is a party to a proposed settlement agreement, under Bankruptcy Rule 9019, courts have held that "closer scrutiny of insider agreements should be added to the cook book list of factors that Courts use to determine whether a settlement is fair and reasonable."  *See, e.g.*, *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 498 (Bankr. S.D.N.Y. 1991).

B.      <u>The Debtors have failed to meet their burden to show that the Settlement Agreement is within the range of reasonableness, fair and equitable, or in the best interests of the Debtors' estates.</u>

     *i.      The Settlement Agreement provides no benefits to the Debtors' estates.*

30.     The Settlement Agreement seeks to resolve the Georgia Action, which, by APF's own admission, does not involve any of the Debtors.  *See* APF Opp. ¶ 25.

31.     Perhaps in light of this fact, coupled with the fact that the Yens are the ultimate beneficiaries of the Settlement Agreement, the Debtors struggle to distinguish between the Yens' interests and the Debtors' estates' interests in establishing the benefits derived from this settlement. Instead, the Debtors focus on how this settlement benefits the Yens (presumably because they cannot articulate any benefit to the Debtors' estates).

32.     Indeed, when analyzing the probability of success in litigation (which is, in essence, continuing the Stay Motion for the benefit of the Yens), the Debtors assert that "[i]n addition to the benefit of not having the Consent Judgment entered against **them**, the Settlement Agreement provides **the Yens** with an extended maturity date, deferral and/or waiver of default interest and past due interest and interest only payments for the next year."  Settlement Mot. ¶ 20 (emphasis added).

33.     However, the Debtors' arguments for how the Settlement Agreement benefits the Yens alone is insufficient for the Debtors to meet their burden to show that the Debtors' entry into the Settlement Agreement is reasonable, fair and equitable, or in the best interests of the Debtors' estates.

34.     With respect to the paramount interest of creditors, the Debtors again are focused solely on the benefits to the Yens personally or the other non-debtor parties to the APF Loans.

35.     In paragraph 24 of the Settlement Motion, the Debtors allege that the Settlement Agreement "eliminates the existential risk that a $19+ million Consent Judgment is entered against

the Yens" which would, among other things, "potentially force a liquidation that would harm all creditors."  Settlement Mot. ¶ 24.  Similarly, in that same paragraph, the Debtors allege that the settlement, by reducing interest rates and fees, "dramatically reduces the economic burden on [Su-Mei Yen] and by extension the Debtors."  *Id.*

36.    However, despite these sweeping statements, the Debtors fail to allege how the elimination of a $19 million judgment against the Yens or the reduction of any interest or fees to be paid by the Yens impacts the Debtors' estates or their ability to reorganize.

> ii.    *The Debtors' estates receive no consideration in exchange for overly broad releases of APF.*

37.    The Debtors have failed to meet their burden to demonstrate why the Debtors' broad releases under the Settlement Agreement are reasonable, necessary or even supported by any consideration.

38.    Per section 8(c) of the Settlement Agreement, which provides for a broad release of APF, the Debtors are not only releasing each of the APF entities, but also a long list of related parties (including shareholders, parents, or affiliates) from any and all claims or causes of action, known or unknown, in any way related to the APF entities, including, but not limited to, the APF Loans (which did not involve the Debtors other than SBY) and "any other dealings" between the Debtors and APF.  *Id.*

39.    Basically, there is no limit to the nature of the releases given by the Debtors other than it must involve one of the APF entities or a party related to one of the APF entities.

40.    The Debtors incorrectly state that the releases sought to be approved are **<u>mutual</u>**. Settlement Mot. ¶ 28 ("Courts in this district regularly approve releases in Rule 9019 settlements where, as here, the releases are mutual . . . .").

41.     However, this is **not** the case, as there is nothing in the Settlement Agreement that provides that either APF or any of its related entities are releasing the Debtors or their respective estates.

42.     Thus, it does not appear that Debtors are receiving any consideration in exchange for these overly-board releases.[8]  APF is not contributing any cash to the Debtors' estates, nor is APF releasing any claims it may have against the estates.

43.     Yet the Debtors describe the consideration being received by the estates as "concrete and substantial":

> a reduction of the interest rate from the default rate to 5% per annum; complete waiver of default-rate interest, late fees, and the Exit Fee (potentially millions of dollars of savings) upon timely payoff; a New Maturity Date through May 8, 2027 providing a full year to refinance; withdrawal of the Default Request that threatened the Yens with a $19+ million judgment; the Lender Parties' commitment to cooperate with refinancing; and definitive, permanent resolution of all pending litigation in two courts.

Settlement Mot. ¶ 29.

44.     Again, and as noted above, each and every one of the aforementioned "factors" inures only to the benefit of the Debtors' **principals**.  The "millions of dollars of savings" from a reduced interest rate do not benefit to the estates, nor does an extended maturity date of what amounts to the Yens' personal obligations.

---

[8]     Although the Debtors argue that the estates have "no material claims to release," Settlement Mot. ¶ 26, this is contradicted by the Debtors' repeated references to the potential involvement of the Debtors with the APF Loans, including but not limited to the Debtors making payments to APF on account of the APF Loans through the proceeds of the Debtors' operations.  See Stay Mot. ¶¶ 11, 17; Settlement Mot ¶ 12.  The Debtors have provided no explanation for any analysis performed to reach a contrary conclusion.  *See* Settlement Mot. ¶ 26.

*iii.*     *The Settlement Motion and Settlement Agreement contain material drafting issues.*

45.     The Settlement Agreement defines SBY as both an "Obligor" and a Debtor.  *See* Settlement Agreement at 1.

46.     Although Secured Lender believes that this may be a drafting error, it is something that has dramatic import since, if SBY is an Obligor, SBY would be responsible for each and every term and condition of the Settlement Agreement applicable to the Yens and the other non-debtor Obligors, including, but not limited to, the requirement to make monthly payments to APF, the requirement to repay the outstanding indebtedness under the APF Loans as of May 8, 2027, and an acknowledgment of the amount of the Obligors' indebtedness to APF.  *See* Settlement Agreement Sections 3, 5.

47.     In addition to this drafting error, paragraph 3 of the Proposed Order attached as Exhibit A to the Settlement Motion states: "**The Debtors** are authorized to enter into and perform all of their obligations under the Settlement Agreement, including without limitation: (i) making the monthly interest payments to HDDA, LLC at 5% per annum on the first day of each month commencing June 1, 2026; (ii) satisfying all amounts owed under the Loans in full on or before May 8, 2027; and (iii) withdrawing the Stay Motion (Doc. No. 120) with prejudice."  (Emphasis added).

48.     Given the above, it is unclear whether SBY (or any of the Debtors) is responsible for the economic terms of the Settlement Agreement, or whether the Proposed Order seeks to authorize the Debtors to make payments under the Settlement Agreement to APF.

49.     If the above issues are the result of a scrivener's error, then the Settlement Agreement should not be approved in its current form.  If intentional, then the Settlement

Agreement is unreasonable, not fair and equitable to the Debtors' creditors, and not in the best interest of the Debtors' estates.

50. Neither SBY nor any of the other Debtors have scheduled a claim for any of the APF entities or the obligations under the APF Loans. *See, e.g.*, Doc. No. 180.

51. Moreover, as of the date hereof, none of the APF entities have filed a proof of claim against SBY or any of the other Debtors.

52. The terms of the Settlement Agreement as drafted would essentially transform a prepetition claim against the Debtors (if one even existed) into a claim with administrative expense priority. Creating additional claims against the estates for no benefit (as explained above) falls well below the range of reasonableness and comes at the expense of the Debtors' existing creditors who are not parties to Settlement Agreement, and so it is also not fair and equitable.

     *iv. The Settlement Agreement is an insider agreement and may not be the product of arm's-length negotiations, which invites further scrutiny.*

53. As explained above, the Settlement Agreement was negotiated with the Debtors' insiders and is for their sole benefit. Consequently, whether the Settlement Agreement is reasonable and in the best interests of the Debtors' estates is subject to further scrutiny. *See In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. at 498.

54. A settlement agreement being the product of an arm's-length negotiation is also a factor relevant to a court's determination of whether a debtor has met its burden to demonstrate that the terms of that settlement are reasonable and in the best interests of a debtor's estate. *See In re Scripsamerica, Inc.*, 634 B.R. at 874.

55. Upon information and belief, the Debtors' proposed bankruptcy counsel negotiated the Settlement Agreement, a settlement agreement that benefits the Debtors' principals and one by which they will receive substantial benefits thereunder.

14

56.     Despite repeated requests, the Debtors have not identified the counsel that negotiated the Settlement Agreement on behalf of the Yens or the other non-debtor Obligors either in the Settlement Motion or in response to Secured Lender's direct question on that issue.

57.     Thus, Secured Lender believes that the Settlement Agreement was not the product of arm's-length negotiations.

## RESERVATION OF RIGHTS

58.     Secured Lender reserves and preserves any and all rights afforded to it, either at law or in equity, to amend, supplement, modify or file further responses and/or objections to the Settlement Motion.

59.     Secured Lender further reserves and preserves any and all rights afforded to it, either at law or in equity, to: (a) enforce its rights and interests under the Loan Documents and Mezzanine Loan Documents (each as defined in the Cash Collateral Objection), including, without limitation, the right to: (i) seek relief from the automatic stay and (ii) take such other action as it may deem necessary and appropriate to preserve, protect, and enforce its rights against any of the Debtors and/or the Debtors' bankruptcy estates; and/or (b) take such other action as it may deem necessary and appropriate, including, but not limited to, seeking the dismissal and/or conversion of these cases and/or the appointment of a chapter 11 trustee.

*[The remainder of this page is left blank intentionally.]*

## **CONCLUSION**

WHEREFORE, Secured Lender respectfully requests that this Court (a) sustain the

Objection and deny the Settlement Motion and (b) grant such relief as is necessary and proper.


Dated: May 27, 2026     Respectfully submitted,
   Wilmington, Delaware

            */s/ Lawrence J. Kotler*
            Lawrence J. Kotler, Esq. (DE No. 4181)
            Sommer L. Ross, Esq. (DE No. 4598)
            DUANE MORRIS LLP
            1201 North Market St, Suite 501
            Wilmington, DE 19801
            Telephone: (302) 657-4900
            Email: LJKotler@duanemorris.com
              SLRoss@duanemorris.com

            -and-

            Meagen E. Leary, Esq. (admitted *pro hac vice*)
            DUANE MORRIS LLP
            Spear Tower
            One Market Plaza, Suite 2200
            San Francisco, CA 94105-1127
            Telephone: (415) 957-3230
            Email: meleary@duanemorris.com

            -and-

            Brad Lenox, Esq. (admitted *pro hac vice*)
            DUANE MORRIS LLP
            22 Vanderbilt
            335 Madison Avenue, 23rd Floor
            New York, NY 10017-4669
            Telephone: (212) 692-1094
            Email: BLenox@duanemorris.com

            *Attorneys for ACORE Capital Mortgage, LP, in its*
            *capacity as Administrative Agent of Delphi CRE*
            *Funding LLC*